# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ROBERT RYBAKOWSKI,

     **Plaintiff,**

     v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

     **Defendant.**

**No. 13 C 6775**

**Magistrate Judge Mary M. Rowland**

## MEMORANDUM OPINION AND ORDER

Plaintiff Robert Rybakowski filed this action seeking reversal of the final decision of the Commissioner of Social Security denying his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 *et seq*, 1381 *et seq*. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C § 636(c), and Plaintiff has filed a request to reverse the ALJ's decision and remand for additional proceedings. For the reasons stated below, the case is remanded for further proceedings consistent with this Opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp.

2d 973, 976-77 (N.D. Ill. 2001).[1] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops inquiry and leads to a determination that the claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq*. The standard for determining DIB is virtually identical to that used for Supplemental Security Income (SSI). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB[2] and SSI on January 10, 2008, alleging he became disabled on August 19, 2006 due to a left elbow injury, rotator cuff surgery, and a bad right knee. (R. at 115-16, 119, 515). The application was denied initially on February 27, 2008, and upon reconsideration on August 20, 2008. (R. at 115-18). Plaintiff, represented by counsel, testified before an Administrative Law Judge (ALJ) on August 19, 2009. (R. at 51-114). On September 25, 2009, an ALJ issued a decision denying benefits (R. at 19-27), and the Appeals Council denied review on June 24, 2010 and December 23, 2010. (R. at 1-3, 12-14). Plaintiff filed a civil action in the Northern District of Illinois. *Rybakowski v. Astrue*, 1:10-CV-05351 (filed Aug. 24, 2010). On November 9, 2009, Plaintiff filed a second set of applications for DIB and SSI that was denied through the reconsideration level. (R. at 679-85). On December 19, 2011, the district court remanded the first case (R. at 595-599), and on April 26, 2012, the Appeals Council entered an order remanding to the ALJ with instructions; the district court's remanded action was consolidated with Plaintiff's second set of applications for DIB and SSI. (R. at 504-09, 516).

After the case was remanded, ALJ Steven H. Templin held a supplemental hearing on May 9, 2013. Plaintiff, represented by counsel, testified. The ALJ also heard testimony from Thomas Gusloff, a vocational expert, and Ashok Jilhewar, M.D., a medical expert. (R. at 540-594). The ALJ issued a partially favorable decision on June 28, 2013, finding Plaintiff disabled as of September 4, 2012. (R. at 511-533).

---

[2] Plaintiff's date last insured for DIB is September 30, 2011. (R. at 230).

The decision determined Plaintiff was eligible for SSI benefits, but not eligible for DIB benefits.

Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity at any time material to the decision, with an alleged disability onset date of August 19, 2006. (R. at 518). At step two, the ALJ found that Plaintiff had severe musculoskeletal impairments. (R. at 518-524). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (R. at 524). The ALJ then assessed Plaintiff's residual functional capacity (RFC)[3] and determined that, as of the onset date, Plaintiff had the residual functional capacity to perform a range of light work, and as of September 4, 2012, Plaintiff was limited to sedentary work. (R. at 524). Based on Plaintiff's RFC and the VE's testimony, the ALJ determined at step four that Plaintiff is unable to perform any past relevant work. (R. at 531). At step five, based on Plaintiff's RFC, his vocational factors, and the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform prior to September 4, 2012. (R. at 531). Accordingly, the ALJ concluded that Plaintiff was disabled on September 4, 2012, but not under a disability prior to that date. (R. at 533). Plaintiff now seeks judicial review of the ALJ's decision that he was not disabled prior to September 4, 2012,

---

[3] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008).

which stands as the final decision of the Commissioner. *See* 20 C.F.R. § 404.984(a) ("when a case is remanded by a Federal court for further consideration, the decision of the administrative law judge will become the final decision of the Commissioner after remand [ ] unless the Appeals Council assumes jurisdiction of the case").

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) of the Social Security Act. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing 42 U.S.C. § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of

the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. MEDICAL EVIDENCE

In 1994, Plaintiff fractured his left elbow and scaphoid after falling off of stilts at work. (R. at 315, 354). He sustained a radial head fracture and underwent open reduction and internal fixation surgery and three screws were inserted into the bone. (R. at 324-25). On June 16, 2003, Plaintiff underwent right rotator cuff repair surgery on his right shoulder. (R. at 321). In 2006, Plaintiff was involved in a rear-end

collision and diagnosed with a bruised kidney which resulted in severe lower back pain. (R. at 290).

### David Schafer, M.D.

On May 15, 2007, Plaintiff saw David Schafer, M.D., an orthopedic surgeon, for left elbow pain. He stated his pain was 8/10 and he was unable to extend his elbow. Plaintiff was referred to physical therapy. (R. at 387-88). Plaintiff was discharged from physical therapy on August 9, 2007. (R. at 385). At a follow-up on September 18, 2007, he was unable to perform simple work activities with his left upper extremity because of loss of motion and pain. (*Id.*). A physical exam showed mild swelling, tenderness, crepitus, and decreased range of motion and strength secondary to pain. (*Id.*). He was diagnosed with left elbow post-traumatic arthritis and right knee possible meniscal tear. (R. at 386, 405). The option of total elbow arthroplasty was noted, but Dr. Schafer indicated that even with surgical treatment, Plaintiff would not return to his previous level of activity in his left upper extremity. (R. at 386). Dr. Schafer opined Plaintiff is "unable to perform any excessive left upper extremity lifting activities or use because of the loss of motion and painful symptoms. I believe these deficits to be permanent based on his current x-rays and physical exam findings." (*Id.*). Dr. Schafer also filled out a "Physician's Statement of Disability" form noting Plaintiff had left elbow post-traumatic arthritis and that he could engage in employment with "no use of left upper extremity." (R. at 390).

On December 4, 2007, Plaintiff followed up on his post-traumatic elbow arthritis reporting that any lifting exacerbated his pain. (R. at 383). Physical exam showed

tenderness and mild swelling in the elbow, with crepitus, decreased strength, and a decreased range of motion secondary to pain. (*Id.*). Right knee MRI results showed a tear in the posterior horn of the meniscus. (*Id.*). Plaintiff also complained of weakness in his right shoulder. (*Id.*). Dr. Schafer diagnosed post-traumatic arthritis of the left elbow, right shoulder weakness following rotator cuff repair, and right knee asymptomatic medial meniscal tear and iliotibial band syndrome, and noted a steady decline in function with the right shoulder. (R. at 384). Dr. Schafer referred him to physical therapy. (*Id.*).

### Joshua Alpert, M.D.

On October 15, 2008, Plaintiff was referred by his primary care physician, Gordon Newsom, M.D., to treating orthopedist Joshua M. Alpert, M.D., for his left elbow. (R. at 474). Dr. Alpert examined Plaintiff and recommended physical therapy for his right shoulder and left elbow, and noted that Plaintiff "clearly cannot do any kind of work or lifting with his left elbow at this time." (R. at 472). Plaintiff had difficulty rotating his arm in supination and had clicking in the elbow with decreased range of motion. (R. at 473). Dr. Alpert noted that if conservative treatment continued to fail, Plaintiff would require either a total elbow arthroplasty or a large elbow release debridement and removal of osteophytes. At physical therapy, he had increased left elbow complaints of 8/10 pain. (R. at 475). He was noted as ambulating with a protective left upper extremity posture with decreased arm swing and elbow extension. (R. at 475). He reported that physical therapy had not improved his impairments and that he had been doing worse. (R. at 471). In November 2008, a

physical therapy progress report noted his left elbow continued to lock up. (R. at 485).

On November 26, 2008, at a follow-up with Dr. Alpert, Plaintiff reported worsening pain and a decreased range of motion. (R. at 470). He tried to follow-up with an elbow specialist recommended by Dr. Alpert, but he could not get an appointment due to his insurance. (*Id.*). Dr. Alpert diagnosed left elbow post-traumatic arthritis and carpal tunnel disease in the wrist. (*Id.*). Dr. Alpert opined that Plaintiff could do some desk activities, and noted he could do some work hardening[4] or get a functional capacity evaluation by a physical therapist to see what kind of job, if any, he could do. (R. at 469). On December 3, 2008, Dr. Alpert noted that Plaintiff's insurance would not approve a worker's hardening or functional capacity evaluation, and would only approve more physical therapy. Dr. Alpert could only recommend a referral at that time to an outside orthopedic surgeon trained in upper extremity surgery, particularly elbow surgery, for a consultation. (R. at 468).

**Other Treatment**

February 2009 progress notes from Dr. Newsom indicate Plaintiff's hands and feet were swollen, his leg went numb from his calf down into the foot, and his right arm from the elbow down to the hand was numb. (R. at 489). On August 12, 2009, Dr. Newsom referred him to James Fister, M.D., an orthopedist, for evaluation of chronic lower back pain. (R. at 498). A September 2, 2009 assessment by Dr. Fister

---

[4] Work hardening is "a highly structured, goal-oriented, individualized treatment program designed to maximize a person's ability to return to work. Work hardening uses work (real or simulated) as a treatment modality." http://medical-dictionary.thefreedictionary.com/work+hardening.

noted a normal MRI of the lumbar spine and recommended physical therapy. (R. at 497, 500).

On March 12, 2010 and September 24, 2010, Plaintiff went to the VNA Health Center in Elgin, Illinois, for back pain (R. at 771, 773); on May 26 and 28, 2010 he went to AcuCare Total Health for back pain and was diagnosed with lumbar disc degeneration. (R. at 785-89). Finally, Plaintiff went to the Sherman Hospital Emergency Department on June 1, 2010 for back pain (R. at 814), July 12, 2010 for right ankle pain (R. at 807), May 28, 2011 for left knee pain (R. at 769), March 13, 2012 for right and left knee pain (R. at 798), and May 18, 2012 for right knee pain and swelling. (R. at 790).

## Mark Thompson, M.D.

On September 4, 2012, Plaintiff began treating with Mark Thompson, M.D., at the Greater Elgin Family Care Center walk-in clinic. (R. at 751). On April 19, 2013, Dr. Thompson filled out an Arthritis Residual Functional Capacity Questionnaire diagnosing osteoarthritis in both knees. (R. at 778-84). He opined that Plaintiff could frequently lift less than 10 pounds, occasionally 10 pounds, and never more. (R. at 779). He could rarely twist and never stoop, crouch, climb ladders, or stairs; his pain would constantly interfere with attention and concentration; he was not a malingerer; he could walk less than one city block without rest or severe pain; and he could sit for 20 minutes at a time. (R. at 779-81). He could stand 5 minutes at a time, could stand and walk less than two hours in an eight-hour day, and could sit at least six hours in an eight-hour day. (R. at 782). He needed to walk around every

15-20 minutes for five minutes and needed to be able to shift at will from sitting, standing, and walking, with unscheduled breaks every one to two hours. (R. at 782). His impairments were likely to cause goods days and bad days and he was likely to be absent from work more than four days a month. (R. at 783).

**Examining and Non-Examining Consultants**

On February 22, 2008, Charles Kenney, M.D., a DDS non-examining medical consultant, conducted a physical RFC assessment and opined Plaintiff was limited to light exertion with no postural limitations. (R. at 435-42). On August 15, 2008, David Mack, M.D., affirmed, but noted Plaintiff could no more than occasionally kneel, crouch or crawl, but had no manipulative limitations. (R. at 458-65).

On July 29, 2008, Roopa Karri, M.D., a consultative examiner, noted Plaintiff limped on the right and could not squat. (R. at 454). He had crepitus in his elbow and right knee, and tenderness in his left elbow, left wrist, right shoulder, right calf and right knee. (R. at 455). He could not straighten his left elbow. (*Id.*). He was assessed with a history of right shoulder rotator cuff surgery with decreased range of motion, carpal tunnel syndrome with mildly decreased grip strength on the left hand, and a history of low back pain with mildly decreased range of motion, and obesity. (R. at 455-56).

On June 7, 2012, consultative examining orthopedic physician, Charles O'Laughlin, Jr., M.D., conducted an exam. (R. at 735-750). He recorded 80% reduction in strength in the left forearm, no supination, and reduced pronation. His report noted no evidence of severe involvement of his upper or lower extremities (R. at

742), and no evidence of any severe impairments to his postural activities. (R. at 743).

## Ashok Jilhewar, M.D., Medical Expert

Ashok Jilhewar, M.D., an internist, testified at the hearing. He noted that at a height of approximately 5 feet, 6 inches and a weight of 262 pounds, Plaintiff's BMI translated to 42.6, or morbid obesity. (R. at 564-65). He opined that coupled with degenerative changes in the claimant's knees and low back, this would reduce his sustained ability to stand and/or walk to the sedentary level as of April 13, 2013. (R. at 564).

With respect to Plaintiff's knee pain, he noted that November 19, 2007 X-rays showed a medial meniscus tear, and degenerative joint disease with abnormalities in the cartilage. (R. at 548). Knee flexion was decreased at 135 degrees, normal being 140. (R. at 548). He opined that a meniscal tear tends to improve over a period of 6 to 9 months. (R. at 549, 562).

## Plaintiff's Testimony

At Plaintiff's initial hearing in 2009, Plaintiff testified that he has constant pain in his left elbow at 7 to 8/10 on average. (R. at 70). His elbow had gotten worse over the year and he could not turn his hand over. (R. at 75). He could not hold his arms above his head for long (R. at 78); his knee pain was 5 to 8/10 with cracks and aches (R. at 80); he could stand 5-10 minutes and sit for 20-25 minutes before he would have to get up (R. at 86-87); walking caused knee pain (R. at 98); and he took naps every day for 1-2 hours. (R. at 93-94). At the supplemental hearing on May 9, 2013,

Plaintiff testified that his knees, right shoulder, and left elbow arthritis had gotten worse (R. at 570-71) and his knee pain was at a 6/10 on medication and constant. (R. at 576). Plaintiff testified that he could not afford knee surgery because he is on Medicaid and his wife lost her insurance several years ago. (R. at 572). When he had his left elbow and rotator cuff surgeries, he was covered by health insurance through the union. (R. at 572-73). He noted he still has to take daily naps for 1-2 hours (R. at 577); he becomes "woozy" or "drowsy" from taking pain pills, such as Naproxen and Hydrocodone (R. at 576); and his pain medication gives him stomach aches. (*Id.*).

## V. DISCUSSION

### A. The ALJ's evaluation of Plaintiff's treating physicians is not supported by substantial evidence.

The ALJ found Plaintiff capable of a range of light work prior to September 4, 2012. (R. at 524). Plaintiff contends that the ALJ improperly rejected the opinions of three treating physicians: Dr. Alpert, Dr. Schafer, and Dr. Thompson. (Mot. at 9). By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2); *accord Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). A treating physician typically has a better opportunity to judge a claimant's limitations than a non-treating physician.

*Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). If the treating physician's opinion "is well supported and there is no contradictory evidence, there is no basis on which the administrative judge, who is not a physician, could refuse to accept it." *Bauer*, 532 F.3d at 608 (citation omitted). "Thus, to the extent a treating physician's opinion is consistent with the relevant treatment notes and the claimant's testimony, it should form the basis for the ALJ's determination." *Bates v. Colvin*, 736 F.3d 1093, 1100 (7th Cir. 2013) (citation omitted). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion," and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014) (citing 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1)) (other citation omitted).

The Court finds that the ALJ's assessment of Plaintiff's treating physicians is not supported by substantial evidence. First, Plaintiff argues that the ALJ improperly weighed Dr. Schafer's opinion. The ALJ stated:

> The medical expert noted that the impairment of which [Dr. Schafer] was most concerned would be expected to last from 6 to 9 months, and noted the minimal reduction in flexion from a normal of 150 degrees to 135 degrees at that doctor's last evaluation of the claimant. Thus, that specialist's opinion in September 2007 is not inconsistent with the opinions of the medical expert or reviewing physician consultants to the DDS.

(R. at 530) (citations omitted).

The ALJ is referring to the medical expert's opinion that Plaintiff's meniscus tear to his knee, revealed in a November 2007 MRI, would improve in 6-9 months. (R. at 549). In fact, the impairment that Dr. Schafer was "most concerned" with, and the focus of the office visits as well as Dr. Schafer's "Statement of Disability," was Plaintiff's left upper extremity. The crux of Dr. Schafer's September 2007 opinions is that Plaintiff's inability to use his left upper extremity is permanent. (R. at 386, 390). The ALJ does not address this portion of Dr. Schafer's assessment. The DDS consultants opined that Plaintiff had some ability to use his left upper extremity, which does contradict Dr. Schafer's core finding. As stated, the ALJ does not directly address this portion of Dr. Schafer's opinion. The ALJ fails to consider Dr. Schafer's opinion that Plaintiff could not perform work requiring use of the left upper extremity, yet appears to implicitly reject it by adopting the conflicting opinions of non-examining physicians. Furthermore, it is legally insufficient for the ALJ to reject Dr. Schafer's opinion based only on the conflicting opinions of non-examining physicians. An ALJ cannot adopt the opinions of the DDS doctors without resolving the apparent conflict between the opinions. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003).

The Commissioner argues that "[w]hile the ALJ did not expressly address in the hearing decision Dr. Schafer's left arm extremity limitation, the ALJ discussed evidence elsewhere that provided rationale for the ALJ's decision not to adopt the limitation in the RFC." (Resp. at 6). The Commissioner notes that: (1) the ALJ accepted the limitations of the medical expert that Plaintiff could use his left arm to lift up to

five pounds and do tasks with the left arm that did not require "full extension" (R. at 529); and (2) the ALJ noted the DDS findings, which included no more than occasional left arm reaching limitations. (R. at 528). The Commissioner argues that "a plain reading shows" the ALJ discussed Dr. Schafer's opinion and relevant evidence. Contrary to this assertion, a plain reading of the ALJ's decision indicates that Dr. Schafer's opinion was not discussed, let alone properly weighed by the ALJ. The fact that the medical expert came to a different conclusion than Dr. Schafer is not a sufficient reason to reject the treating source's opinion. *Gudgel*, 345 F.3d at 470 ("An administrative law judge can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice."); *see also Nimmerrichter v. Colvin*, 4 F.Supp.3d 958, 970 (N.D. Ill. 2013) ("the non-examining medical expert's opinion alone cannot serve as a reason for rejecting the treating [physician's] opinion"). The ALJ provides no "good reasons" for discounting the treating physician's opinion, other than an improper reliance on non-examining physicians' opinions.

This is particularly concerning because, on remand from this Court, the Appeal Council explicitly noted that the previous ALJ had failed to "expressly consider all of the treatment records by orthopedist Dave Schafer, M.D. (Tr. 383-388), or his opinion that the claimant has no use of his left upper extremity (Tr. at 390)." (R. at 507). The Council continued that the ALJ "did not provide any reasons for not including the limitation in the established residual functional capacity." (R. at 507). In appears this ALJ has repeated this error.

Second, the ALJ failed to consider Dr. Alpert's October 2008 opinion that Plaintiff "clearly cannot do any kind of work or lifting with his left elbow." (R. at 472). November 2008 X-rays showed Plaintiff had "terrible postop arthritis with post-traumatic arthritis with multiple screws in his bone," but Dr. Alpert did note that it was reasonable for Plaintiff to do some desk activities. (R. at 469-70). The ALJ did not mention these assessments in his decision at all. Again, this is particularly concerning because, as part of the Order of the Appeals Council remanding the case to the ALJ, the Council specifically instructed the ALJ to consider the treating source opinions of Joshua M. Alpert, M.D. (R. at 507). The Order went into great detail, noting that Dr. Alpert recommended that the claimant have physical therapy for his right shoulder and left elbow and that if conservative treatment continued to fail, the claimant would require a total elbow arthroplasty or a large elbow release debridement and removal of osteophytes, and that Dr. Alpert believed the claimant clearly could not do any kind of work or lifting with his left elbow. (*Id.*). The Appeals Council specifically noted the original ALJ failed to consider Dr. Alpert's November 26, 2008 opinion that claimant can do some desk activities and Dr. Alpert's December 3, 2008 referral to an orthopedic surgeon. (*Id.*). It is evident that a central part of the remand decision by the Appeals Council focused on a more thorough evaluation of Dr. Alpert's opinions.

The only mention of Dr. Alpert in the ALJ's decision is when the ALJ discusses whether Plaintiff had a "severe" impairment. The ALJ notes Dr. Alpert reported reduced pronation and no supination in the left upper extremity. (R. at 523). The ALJ

relied on the medical expert's assessment that "while some degree of limited supination is associated with the post-traumatic arthritis in the claimant's elbow, there is no medically determinable impairment established to explain the reduced pronation." (R. at 523). There is no mention of Dr. Alpert or his opinions regarding Plaintiff's ability to work and his limitations in the RFC assessment. The Commissioner argues that the ALJ adequately considered the findings of Dr. Alpert when he weighed Dr. Alpert's assessment of Plaintiff's reduced pronation and supination against the medical expert's opinion that there was no medically determinable impairment that would explain the reduced pronation. (Resp. at 6; R. at 523). Although the ALJ mentioned this part of Dr. Alpert's medical exam, the ALJ failed to evaluate or weigh the medical opinions, including that Plaintiff "cannot do any kind of work or lifting with his left elbow" (R. at 472), in considering the RFC.

The ALJ failed to properly assess Dr. Alpert's opinions. The opinions of a treating physician need to be weighed pursuant to 20 C.F.R. § 404.1527. *See also* SSR 96-2p.[5] Instead, the ALJ did not mention Dr. Alpert's assessments, weigh his opinions, or consider them when evaluating the RFC, despite specific instructions by the Appeals Council to do so.

Third, Plaintiff argues that the ALJ failed to explain why he found Dr. Thompson's April 13, 2013 opinion inconsistent with his own treatment notes and the rec-

---

[5] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000) (internal citations omitted); see 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably bound by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

ord as a whole. (R. at 530). The ALJ noted Dr. Thompson's "description of the claimant's level of functioning is consistent with the limitations of an individual appropriately placed in a skill nursing facility. This degree of dysfunction is inconsistent with his own treatment records, let alone the record as a whole." (*Id.*). The ALJ continues that the April 2013 opinion is "immaterial in this matter" because the medical expert's testimony supports a decision favorable to Plaintiff. (*Id.*). However, the ALJ concluded that the medical expert's opinion and "the implication of [Dr. Thompson] was that, in April 2013, the claimant—in effect—was unable to work." (R. at 531). The ALJ then related the opinions back to September 4, 2012, the date Plaintiff first saw Dr. Thompson. (*Id.*).

Plaintiff is correct that the ALJ found Dr. Thompson's opinion inconsistent with his treatment notes and the record as a whole without providing what evidence in the record was inconsistent or unsupportive. Without an explanation of what medical evidence was unsupportive and why it is relevant, the Court cannot determine whether the ALJ's decision to reject the treating physician's opinion was proper. *Frobes v. Barnhart*, 467 F. Supp. 2d 808, 819 (N.D. Ill. 2006) ("If the ALJ concludes that the treating physician's opinion is inconsistent with other evidence, she must explain the inconsistency."). It also appears the ALJ first finds the April 2013 opinion inconsistent and "immaterial," and then adopts it in finding that Plaintiff was unable to work at that time. It is unclear what part or parts of the opinion the ALJ is crediting or discrediting, and he has failed to build the logical bridge between the facts and the outcome. However, Plaintiff does not explain how Dr. Thompson's

opinion bears on a finding that Plaintiff became disabled prior to September 4, 2012. As Plaintiff has failed to articulate this argument, the Court finds that any error on the part of the ALJ regarding Dr. Thompson was harmless. However, on remand, the law clearly requires the ALJ to consider Dr. Thompson's September 2012 and April 2013 opinions when determining whether Plaintiff was disabled prior to that date. *See Parker v. Astrue*, 597 F.3d 920, 925 (7th Cir. 2010) (The ALJ must "consider *all* relevant evidence, including the evidence regarding the plaintiff's condition at present.").

In sum, the ALJ failed to "build an accurate and logical bridge from the evidence to her conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This prevents the Court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence. On remand, the ALJ shall reevaluate the weight to be afforded Dr. Schafer, Dr. Alpert, and Dr. Thompson's opinions. If the ALJ finds "good reasons" for not giving the opinions controlling weight, *see Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010), the ALJ shall explicitly "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion," *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009), in determining what weight to give the opinions. *See also Scrogham v. Colvin*, 765 F.3d 685, 697 (7th Cir. 2014) ("Even when an ALJ decides not to give controlling weight to a treating physician's opinion,

the ALJ is not permitted simply to discard it. Rather, the ALJ is required by regulation to consider certain factors in order to decide how much weight to give the opinion.").

## B. Substantial evidence does not support the ALJ's credibility determination.

Plaintiff contends that the ALJ erred in discounting Plaintiff's testimony about the nature and extent of his pain prior to September 4, 2012. (Mot. at 13). The ALJ found Plaintiff had chronic musculoskeletal conditions since the mid-1990s, but the ALJ did not credit his statements concerning the frequency and duration of intense symptoms throughout the period at issue. (R. at 528). An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (citations omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p. An ALJ may not discredit a claimant's testimony about her symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("[T]he administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support a claimant's credibility.

*Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted).

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss*, 555 F.3d at 561. The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 96-7p. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

First**,** Plaintiff argues the ALJ improperly discounted Plaintiff's reports of pain on the basis that he made statements to treating professionals that he followed through on non-invasive treatment when, in reality, he did not follow through on non-invasive treatment. (Mot. at 14). The ALJ states that "the claimant has generally not sought invasive procedures for control of his symptoms, and not been shown to have followed through on recommended non-invasive modalities, making his reports that he has done so of dubious validity." (R. at 527-28) (internal citations omitted). The ALJ cites to a May 18, 2012, emergency room visit for right knee pain

and swelling. (R. at 790-92). The physician recommended Plaintiff follow-up with his primary care provider within 3-5 days to further treat his pain. (R. at 792). As Plaintiff asserts, there is no indication that Plaintiff made any statements to treating doctors that he had followed up when in reality he had not. (Mot. at 15). It is unclear what evidence the ALJ relies on in support of this proposition that Plaintiff failed to follow through on treatment while inconsistently reporting that he was following through on it. The ALJ failed to "build an accurate and logical bridge from the evidence to [his] conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). Defendant does not respond to Plaintiff's argument on this issue. The ALJ improperly discredited Plaintiff's credibility on this basis without relying on any evidence in the record.

Next, the ALJ notes Plaintiff infrequently sought treatment as a reason to discredit his allegations of pain. (R. at 527-28). The ALJ states: "Significantly, the claimant's PCP in May 2012 was identified as Dr. Patel; someone he apparently last saw in May 2011, and saw infrequently before then." (R. at 528). The ALJ continues "the claimant acknowledged . . . that, for roughly 3 to 4 years before then, he has had access to treating physicians through Medicaid." (*Id.*). The ALJ discusses Plaintiff's conservative and infrequent treatment as reasons to afford Plaintiff's pain complaints less than full credibility. This analysis is improper.

The ALJ failed to take into account that Plaintiff testified that he could not afford treatment, and the ALJ impermissibly relied on Plaintiff's failure to seek treatment in assessing his credibility. An ALJ may not simply rely on a lack of

treatment to find Plaintiff's allegations incredible. *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). An ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference. *Id.*; SSR 96–7p, 1996 WL 374186, at *7. An ALJ may need to "question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner." SSR 96–7p, 1996 WL 374186, at *7. The claimant's "good reasons" may include an inability to afford treatment, ineffectiveness of further treatment, or intolerable side effects. *Id.* at *8.

There is evidence in the record that Plaintiff tried to follow-up with an elbow specialist as recommended by Dr. Alpert, but he could not get an appointment due to his lack of insurance aside from Medicaid (R. at 470); Plaintiff's insurance would not approve a worker's hardening or functional capacity evaluation (R. at 468); Plaintiff testified that he could not afford knee surgery on Medicaid because he did not have supplemental insurance (R. at 572); and at a visit to the Emergency Department on May 18, 2012, he noted he was on a waiting list through his primary care physician to see a specialist for his knee pain. (R. at 790). The ALJ failed to consider any of these reasons before drawing a negative inference. The ALJ notes in his decision that Plaintiff had access to treating physicians through Medicaid, and uses that as evidence that he is not credible. Yet he ignores Plaintiff's testimony that being on Medicaid, without having supplemental insurance, meant he could not afford several treatment options. (R. at 572).

Third, Plaintiff argues that the ALJ erred in failing to assess Plaintiff's credibility with regards to his statement that he needs to nap for one or two hours a day, and in making mistakes of fact regarding Plaintiff's medication side effects. (Mot. at 17). "[A]n ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, *see* 20 C.F.R. § 404.1529(c); S.S.R. 96–7p, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562.

Plaintiff testified that he becomes "woozy" or "drowsy" from taking pain pills, such as Naproxen and Hydrocodone, and his pain medication gives him stomach aches. (R. at 576). The ALJ disregarded Plaintiff's complaints of side effects caused by his medications, noting:

> The Naproxen would not be expected to cause such a symptom and, as chronically as the claimant has taken narcotic-containing analgesics, the Hydrocodone would not be expected to cause that side effect. Moreover, the claimant has not reported such a side effect to treating clinicians. While narcotic-containing analgesics may cause constipation and, in turn, "stomach ache," as the claimant alleged at the supplemental hearing, he has specifically denied such a side effect, when seeking such drugs.

(R. at 527) (internal citations omitted).

The ALJ does not rely on any medical records in support of his assertions that these medications would not cause the alleged side effects. Instead, the ALJ seemingly made improper independent medical determinations in concluding Plaintiff's testimony about his side effects was incredible. "An ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record." *Clifford*, 227 F.3d at 870; *see Rohan v. Chater*, 98 F.3d 966,

968 (7th Cir. 1996) ("As this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). Moreover, the ALJ also discredited Plaintiff's allegations of medication side effects asserting that Plaintiff did not report side effects to treating clinicians and even denied having stomach aches. (R. at 527). In fact, Plaintiff reported gastrointestinal nausea in a May 18, 2012 visit to the Emergency Department (R. at 790-91) ("Gastrointestinal symptoms: Nausea. No abdominal pain"); Lora Rybakowski, Plaintiff's wife, noted in a third-party report that pain medication "always upsets his stomach" (R. at 301); and Dr. Thompson noted an upset stomach as a possible side effect of Plaintiff's medication. (R. at 781).

With respect to Plaintiff's testimony that he has to take a 1-2 hour daily nap (R. at 577), the ALJ did not consider it as part of his decision. This evidence is unrebutted in the record, and the VE testified that there would be no job, at any level, for a person who needs to nap one hour in an eight hour day. (R. at 592). An ALJ may not ignore evidence that is contrary to his ultimate conclusion. *See Cuevas v. Barnhart*, No. 02 C 4336, 2004 WL 1588277, at *15 (N.D. Ill. July 14, 2004) ("To the extent she chose not to address the issues of pain and naps because she found Mr. Cuevas' testimony on these issues to be incredible, the ALJ was required to explain her reasoning."). On remand, the ALJ must identify the relevant evidence and build a "logical bridge" between that evidence and the ultimate determination. *Moon*, 763 F.3d at 721.

## C. Summary

Because the Court is remanding on the credibility and treating physician issues, the Court chooses not to address Plaintiff's argument that the ALJ erred in his RFC determination. On remand, after determining the appropriate weight to be afforded Plaintiff's treating physicians' opinions, the ALJ shall reassess Plaintiff's credibility with due regard for the full range of medical evidence. The ALJ shall then reevaluate Plaintiff's physical impairments, including his obesity, and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of his findings in accordance with applicable regulations and rulings. Finally, with the assistance of a VE, the ALJ shall determine whether there are jobs that exist in significant numbers that Plaintiff can perform.

## VI. CONCLUSION

For the reasons stated above, Rybakowski's request to reverse the ALJ's decision and remand for additional proceedings is **GRANTED**. Defendant's Motion for Summary Judgment [24] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: October 8, 2015

_____
MARY M. ROWLAND
United States Magistrate Judge